**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ASTOUND BUSINESS SOLUTIONS, LLC, | Case No. _____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| DISH WIRELESS L.L.C., | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Astound Business Solutions, LLC ("Astound" or "Plaintiff"), by and through its undersigned counsel, as and for its Complaint against Defendant DISH Wireless L.L.C. ("DISH" or "Defendant"), alleges as follows:

## NATURE OF THE ACTION

1. This action arises from DISH's brazen refusal to honor its clear and undisputed payment obligations under a Master Service Agreement for Transport Services (the "MSA") that it entered into with Astound on October 25, 2022. After ordering and receiving the benefit of 84 installed telecommunications transport services, and then terminating all 84 of them, DISH has refused to pay the contractually specified Termination Charges (defined below) totaling approximately $1,726,000, hiding behind a contrived and legally meritless force majeure claim that bears no relationship to the description of force majeure events actually contained in the MSA.

2. DISH's purported force majeure event is the sale by its corporate parent, EchoStar Corporation ("EchoStar"), of certain spectrum licenses to AT&T Inc. and Space Exploration Technologies Corporation ("SpaceX") for approximately $40 billion. DISH contends that this sale, a voluntary and lucrative business transaction made by DISH's parent for a substantial profit, relieved

DISH of its obligation to pay Astound for the early termination of transport services that DISH had ordered, received, and enjoyed for years. That contention is frivolous.

3.      The MSA defines "Force Majeure Event" to mean an act of God, an act of a public enemy, an act of war or terrorism, a natural disaster, an epidemic, pandemic or quarantine, or an act of sabotage. EchoStar's decision to sell spectrum licenses to AT&T and SpaceX at a profit of multiple billions of dollars is none of these things. It is a discretionary business decision made by DISH's parent, entirely within the control of DISH and its affiliates, and one from which EchoStar expects to realize billions of dollars in gain – a point that EchoStar's own senior executives have made publicly and on the record, as alleged in further detail below.

4.      DISH's refusal to pay is especially troubling in light of the corporate structure governing the Spectrum Transactions (defined below). EchoStar, not DISH, will receive the approximately $40 billion in transaction proceeds. DISH has itself acknowledged in its Force Majeure Letter (defined below) that it "is not entitled to receive any of the spectrum sale proceeds at closing." Upon information and belief, DISH's refusal to pay and its invocation of a force majeure defense that DISH's own acknowledgments expose as pretextual reflects a decision made at the EchoStar level, with DISH serving as the vehicle through which EchoStar's strategic choices are implemented while EchoStar retains the financial benefits of those choices. Astound is thus confronted with a DISH that has terminated all 84 Services, refuses to pay the resulting Termination Charges, and acknowledges that the billions of dollars generated by the event it invokes as justification will flow not to DISH, but to its parent instead. Astound brings this action to ensure that DISH cannot benefit from this asymmetry by using it as an excuse to evade its contractual obligations to Astound.

5.      DISH's refusal to pay is further undermined by its own three partial payments totaling $161,046.70. By making those payments, DISH is acknowledging that some obligation exists

under the MSA, while simultaneously maintaining that no Termination Charges are owed at all. DISH's position is legally incoherent and contractually without support.

6.      Astound accordingly brings this action to recover: (i) the unpaid balance of the $1,566,457.63 Termination Charge for the seventy (70) Services terminated in October 2025, plus approximately $160,000 in Additional Termination Charges for the fourteen (14) Services terminated in March and April 2026; (ii) cancellation charges totaling $56,931.28 under Section 8(c) of the MSA for the twenty-four (24) in-progress services that DISH cancelled before installation was complete; (iii) a declaratory judgment that DISH's purported force majeure defense is without merit and that the full Termination Charges are owed; and (iv) such other relief as the Court deems just and proper. Astound expressly reserves all rights it may have against EchoStar and any affiliated entities in the event that any steps are taken — whether through continued intercompany transfers, the disposition of Spectrum Transaction proceeds, or otherwise — to impair DISH's ability to satisfy a judgment in this action.

## PARTIES

7.      Plaintiff Astound Business Solutions, LLC is a Delaware limited liability company with its principal place of business at 650 College Road East, Suite 3100, Princeton, New Jersey 08540. Astound provides telecommunications and related services to commercial customers, including cellular carriers, in 11 states and the District of Columbia.

8.      Defendant DISH Wireless L.L.C. ("DISH") is a Colorado limited liability company with its principal place of business at 5701 S. Santa Fe Drive, Littleton, Colorado 80120.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because this is a civil action between citizens of different states where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10.     This Court has personal jurisdiction over DISH. The MSA provides, in Section 26(d), that the parties "consent to the *in personam* jurisdiction of the United States District Court located in New York, NY and the appropriate state court located in New York, NY," and DISH has "waive[d], fully and completely, any right to dismiss and/or transfer any action pursuant to Title 28 U.S.C. Section 1404 or 1406 (or any successor statute)."

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because DISH has consented to jurisdiction in this District and has contractually waived any right to transfer venue. The MSA is expressly governed by and construed in accordance with the laws of the State of New York, and the parties agreed that state and federal New York courts shall have jurisdiction over disputes arising under the MSA.

## FACTUAL ALLEGATIONS

### I.     The Master Service Agreement

12.     On October 25, 2022, Astound and DISH entered into the MSA, which established the general terms and conditions pursuant to which DISH could order from Astound, and Astound could agree to provide to DISH, fiber optic data transport services through the subsequent, mutual execution of one or more market service orders. A true and correct copy of the MSA is attached hereto as Exhibit A.

13.     As contemplated by the MSA, on November 9, 2022, the parties executed Market Service Order #1 (the "MSO"), pursuant to which DISH ordered Ethernet transport Services at a portfolio of cell sites located in Washington, Oregon, California, and Pennsylvania (the "Services"). The MSO was amended three times to refine the inventory of sites at which Services would be provided: on December 9, 2022 (Amendment #1), January 12, 2023 (Amendment #2), and February 16, 2023 (Amendment #3). A true and accurate copy of the MSO and its amendments is attached hereto as Exhibit B.

14.     The MSA contains carefully negotiated provisions governing the consequences of DISH's early termination of Services. Section 9 of the MSA provides for graduated "Termination Charges" if DISH terminates an installed Service prior to the expiration of the applicable Initial Service Term. The Termination Charge depends on how far into the Initial Service Term the Service is when terminated, ranging from one hundred percent (100%) of remaining monthly recurring charges ("MRC") if terminated in year one, to ten percent (10%) of remaining MRC if terminated in year six or beyond. The Initial Service Term for each Service is set forth in the applicable market service order, and, in the case of the MSO, was either sixty (60) or seventy-two (72) months, depending on the Service.

15.     Section 8(c) of the MSA separately addresses the cancellation of Services that have been ordered but not yet fully installed. If DISH cancels a Service prior to delivery of a Connection Notice, DISH is obligated to pay Astound a cancellation charge equal to: (i) one hundred percent (100%) of Astound's itemized, documented, external third-party costs actually incurred as a direct result of the cancellation; plus (ii) documented, non-recurring costs actually incurred by Astound in connection with permitting fees and installation, calculated on a time and materials basis without markup.

16.     Section 26(e) of the MSA contains a detailed and carefully delineated force majeure provision (the "Force Majeure Clause"). The Force Majeure Clause provides that neither party may be held responsible for failure to perform its obligations "if, and only to the extent that, such Party's failure to perform is the result of a Force Majeure Event." The MSA expressly and exclusively defines "Force Majeure Event" to mean: "(i) act of God; (ii) act of a public enemy; (iii) act of war or terrorism; (iv) natural disaster; (v) epidemic, pandemic or quarantine; or (vi) act of sabotage." This definition is comprehensive and exhaustive.

17.    The Force Majeure Clause contains no provision excusing DISH from its own payment obligations as a result of any business decision by DISH or its affiliates.

18.    The MSA is governed by and construed in accordance with the laws of the State of New York, as per Section 26(d). The MSA contains an integration clause providing that it "set[s] forth the entire, final and complete understanding between the Parties relevant to the subject matter of the Agreement." MSA, at Section 26(j).

## II.    Astound Installs 84 Services for DISH

19.    Following execution of the MSO and its amendments, Astound performed substantial work to install the ordered Services. Between May 2023 and May 2025, Astound installed eighty-four (84) Services for DISH across four states: Washington, Oregon, California, and Pennsylvania.

20.    For each installed Service, Astound issued a Connection Notice upon completion of installation, testing, and commissioning. The date of each Connection Notice constitutes the "Billing Start Date," which marks the commencement of the Initial Service Term for that Service and triggered DISH's monthly recurring charge obligations.

21.    At no time prior to September 2025 did DISH raise any objection to the quality, performance, or cost of the Services.

22.    In addition to the eighty-four (84) installed Services, as of September 2025, Astound was actively engaged in the installation of twenty-four (24) additional Services that had been ordered by DISH but for which installation had not yet been completed (the "In-Progress Services"). Astound had incurred third-party costs and internal time-and-materials costs in connection with the In-Progress Services prior to DISH's cancellation thereof.

III.     **DISH's Parent Voluntarily Sells Spectrum Licenses for a Multi-Billion Dollar Profit**

23.     DISH is a wholly-owned subsidiary of EchoStar Corporation ("EchoStar"), a Nevada corporation headquartered in Englewood, Colorado. EchoStar is the ultimate parent company of DISH and controls DISH's operations, strategic direction, and corporate decisions.

24.     In 2019, DISH (then a separate public company) announced its intention to build a nationwide 5G network. To that end, DISH and its affiliates invested over $30 billion in spectrum licenses and committed to aggressive buildout milestones with the Federal Communications Commission ("FCC"). DISH's buildout subsequently fell materially behind its public commitments, a fact disclosed in DISH's own SEC filings in 2022 and 2023.

25.     On August 8, 2023, DISH Network Corporation, which was then DISH's parent, announced a merger with EchoStar, which closed on December 31, 2023. As a result of the merger, DISH became a wholly owned subsidiary of EchoStar. Shortly after the merger closed, DISH Network Corporation transferred a substantial portfolio of spectrum assets to EchoStar and its affiliates. On January 10, 2024, DISH Network Corporation transferred spectrum licenses with an estimated value of $12 billion to EchoStar Wireless Holding L.L.C., a direct subsidiary of EchoStar; those licenses included AWS-4, H-Block, CBRS, C-Band, 12 GHz, LMDS, 24 GHz, 28 GHz, 37 GHz, 39 GHz, and 47 GHz licenses. On March 12, 2024, DISH Network Corporation sold its 700 MHz spectrum licenses to EchoStar for $1 billion. These transactions transferred substantial value from within the DISH enterprise to EchoStar and its non-DISH subsidiaries.

26.     In May 2025, the FCC initiated an inquiry into the underutilization of spectrum licenses held by EchoStar and its affiliates. EchoStar's response to that inquiry was unambiguous. On May 12, 2025, EchoStar's Chairman, Charlie Ergen, told the public and investors that EchoStar had "met or exceeded" all of its buildout commitments. EchoStar's formal written submission to the

FCC, on May 27, 2025, reiterated these representations. And in a formal written submission to the FCC, on June 6, 2025, EchoStar stated that any FCC action to revoke or modify its licenses would be "unlawful, unconstitutional, discriminatory, and utterly baseless."[1]

27.     But EchoStar then turned on a dime. Rather than contest the FCC inquiry, which its own Chairman believed EchoStar would "win," EchoStar made a strategic and highly profitable business decision to sell its spectrum.[2] On August 26, 2025, EchoStar announced a definitive agreement to sell its 3.45 GHz and 600 MHz spectrum licenses to AT&T for approximately $23 billion. On September 8, 2025, EchoStar announced a definitive agreement to sell its AWS-4 and H-Block spectrum licenses to SpaceX for approximately $17 billion. The FCC terminated its inquiry the same day. The aggregate proceeds of these two transactions (the "Spectrum Transactions") are approximately $40 billion.

28.     The Spectrum Transactions were not a forced liquidation. AT&T's Chief Executive Officer publicly acknowledged that AT&T was paying a premium over what DISH had originally paid for the spectrum at auction. That premium is approximately $7 billion. EchoStar's Chairman stated publicly that the spectrum licenses were sold at "market price" and that EchoStar would be "cash-rich" following the Spectrum Transactions. EchoStar's President and Chief Executive Officer, Hamid Akhavan, told the public and investors that the Spectrum Transactions had "kept [EchoStar] in a marketplace in a very aggressive way without any limitations to grow and compete" and that

---

[1] *See* Reply Comments of EchoStar Corporation, *In the Matter of Space Bureau Opens New Docket to Explore EchoStar Corporation's Use of 2 GHz MSS Spectrum*, SB Docket No. 25-173 before the Federal Communications Commission.
[2] EchoStar Corporation (SATS) Discusses on Pioneering What's Next: EchoStar's Vision And Strategy Call (Transcript), Seeking Alpha (Sept. 15, 2025), https://seekingalpha.com/article/4822911-echostar-corporation-sats-discusses-onpioneering-whats-next-echostars-vision-and-strategy-call-transcript; FCC questions EchoStar about how it's using 5G spectrum, Fierce Network (May 12, 2025), https://www.fierce-network.com/wireless/fcc-questions-echostar-about-how-its-using-5gspectrum.

EchoStar's subsidiary Boost Mobile would be "way more competitive" operating as a hybrid Mobile Virtual Network Operator ("MVNO") following the Spectrum Transactions.[3]

29.    The proceeds of the Spectrum Transactions will flow to EchoStar and other of its affiliates, not to DISH. DISH acknowledged this expressly in its own Force Majeure Letter (defined below), stating that DISH "is not entitled to receive any of the spectrum sale proceeds at closing." DISH therefore invokes a transaction generating billions of dollars in profit for its parent as justification for refusing to pay Astound approximately $1.7 million in contractually specified charges.

### IV.    DISH Invokes a Fabricated Force Majeure Claim and Terminates 70 Services

30.    On or about September 25, 2025, DISH sent Astound a letter (the "Force Majeure Letter"), received by Astound's headquarters on September 29, 2025. In the Force Majeure Letter, DISH purported to invoke the Force Majeure Clause of the MSA, asserting that the FCC inquiry and the Spectrum Transactions constituted a "Force Majeure Event" under the MSA that excused DISH from its payment obligations, including any Termination Charges that would otherwise be owed upon early termination of Services. A true and correct copy of the Force Majeure Letter is attached as Exhibit C.

31.    DISH's invocation of the Force Majeure Clause is legally unsupportable. The FCC inquiry, the Spectrum Transactions, and EchoStar's strategic decision to transition its subsidiary Boost Mobile to an MVNO business model do not fall within any of the six enumerated categories of Force Majeure Events under the MSA. They are not acts of God, acts of a public enemy, acts of war or terrorism, natural disasters, epidemics, pandemics, quarantines, or acts of sabotage. They are,

---

[3] EchoStar Corporation (SATS) Discusses on Pioneering What's Next: EchoStar's Vision And Strategy Call (Transcript), Seeking Alpha (Sept. 15, 2025), https://seekingalpha.com/article/4822911-echostar-corporation-sats-discusses-onpioneering-whats-next-echostars-vision-and-strategy-call-transcript.

instead, the consequences of voluntary business decisions made by DISH and its corporate parent, decisions whose profitability EchoStar's own leadership has publicly celebrated.

32. Moreover, even if DISH's circumstances could constitute a Force Majeure Event under the MSA — and they cannot — the Force Majeure Clause addresses only a party's inability to perform its obligations due to a qualifying event. DISH's obligation to pay Termination Charges arises upon DISH's exercise of its own contractual right to terminate Services. No Force Majeure Event caused DISH to terminate the Services. DISH terminated the Services voluntarily, as a consequence of EchoStar's decision to sell spectrum and transition its Boost Mobile business to an MVNO model.

33. On October 8, 2025, Kenneth Williams of Boost Mobile, acting on DISH's behalf, sent Astound's account management team an email notifying Astound that seventy (70) of the installed Services were being deactivated and requesting that Astound's network operations center cease generating repair tickets for those sites. Upon receipt of this notification, Astound's National Account Manager, Anna Whitfield, responded the same day and expressly put DISH on written notice that the affected Services remained within their Initial Service Terms and that Termination Charges under Section 9 of the MSA would apply. Ms. Whitfield's email stated: "All sites listed remain in their Initial Term, and will be Terminating early. Please confirm back that we are approved to move forward with Disconnecting and assessing Termination Charges for each site. Termination Charges will be calculated per the MSA, Section 9. Termination of Installed Services." DISH's representative confirmed that formal disconnect orders would be forthcoming. Astound's contemporaneous written notice to DISH that Termination Charges would be assessed was explicit and unambiguous. True and correct copies of these communications are contained at Exhibit D.

34. DISH subsequently issued formal disconnect notices for all seventy (70) terminated Services: six (6) notices on October 14, 2025, and sixty-four (64) additional notices on October 21,

2025. These formal disconnect notices constituted DISH's exercise of its early termination right under Section 9 of the MSA for each affected Service and triggered the corresponding Termination Charge obligations. Subsequently, on October 17, 2025, Astound received from DISH a payment of $53,573.90, which payment is an acknowledgement by DISH that it retained some financial obligation under the MSA.

35. On November 1, 2025, Astound issued DISH's monthly invoice (a true and correct copy of which is attached as Exhibit E) which included the Termination Charges for the seventy (70) terminated Services in the amount of $1,566,457.63 (the "Termination Charge Invoice"), together with monthly recurring charges of $8,800 for the fourteen (14) Services that remained active. The invoice reflected a prior account balance and credits, yielding a total amount due of $1,619,916.94. The Termination Charges of $1,566,457.63 were calculated in strict accordance with the graduated schedule set forth in Section 9 of the MSA, based on the Billing Start Date for each terminated Service and the applicable MRC. The calculation underlying the Termination Charges for each of the 70 terminated Services, including the Billing Start Date, applicable MRC, Initial Service Term, and resulting Termination Charge for each Service, is set forth in the inventory record included in Exhibit E.

36. On November 12, 2025, DISH transmitted a partial payment of $53,736.40 to Astound. This partial payment, while acknowledging the existence of some financial obligation, does not satisfy DISH's obligations under the MSA and leaves the vast majority of DISH's outstanding obligations unpaid.

**V. The December 2025 Call and DISH's Cancellation of the In-Progress Services**

37. Notably, DISH never invoked force majeure as a basis to terminate the fourteen (14) remaining active Services. Instead, it elected to retain those Services and continued to incur and pay monthly recurring charge obligations under the same MSA through March 2026. The Force Majeure

Event DISH purports to invoke, namely EchoStar's sale of spectrum licenses and the resulting transition of its Boost Mobile business to an MVNO business model, applied equally, if at all, to all Services under the MSA from the moment DISH sent its Force Majeure Letter in September 2025. When DISH ultimately terminated the fourteen remaining Services in March and April 2026, it did so through standard contractual disconnect notices, without any invocation of force majeure. DISH's decision to selectively assert force majeure as to seventy Services while continuing to perform under the MSA for fourteen others for months thereafter, and then terminating those fourteen through ordinary contractual means, confirms that the October 2025 terminations were a discretionary business decision, as opposed to the product of any genuine Force Majeure Event.

38.    On November 25, 2025, Astound's Vice President of National Sales, JoAnne Drexler, emailed DISH requesting a call to discuss the outstanding issues. DISH responded that any such call would be held under Federal Rule of Evidence 408, and Ms. Drexler looped in Astound's counsel.

39.    On or about December 10, 2025, DISH confirmed to Astound, in writing: (i) its intent to retain the fourteen (14) remaining active Services; and (ii) its cancellation of all twenty-four (24) In-Progress Services.

## VI.    Astound's Formal Rejection of the Force Majeure Claim and DISH's Default

40.    On December 24, 2025, Astound sent DISH a formal written notice by hard copy letter, transmitted to both MSA notice addresses and to the signatory of the Force Majeure Letter, expressly rejecting DISH's force majeure defense and notifying DISH that it was obligated to pay the Termination Charges in full. Astound's letter stated that EchoStar's decision to sell spectrum licenses does not constitute a Force Majeure Event as defined in the MSA, and that Astound expected DISH to pay the invoiced Termination Charges as required by the Agreement.

41.     On January 29, 2026, DISH's Senior Corporate Counsel, Christopher Bosch, responded by letter on behalf of DISH (a true and correct copy of which is attached as Exhibit F), reiterating DISH's force majeure position. DISH's letter asserted that "the FCC gave EchoStar no choice but to sell or forfeit spectrum needed to operate DISH's network," and claimed it was "impossible to foresee or predict that the FCC would force EchoStar to forfeit its spectrum" because EchoStar had allegedly "met all buildout and other related requirements imposed by the FCC." DISH's letter further characterized the spectrum sale as "involuntary and unavoidable" and concluded that DISH "is not obligated to pay early termination or cancellation charges in this scenario."

42.     DISH's characterizations in the January 29 letter are directly contradicted by EchoStar's own statements and conduct. EchoStar's formal written submissions to the FCC in May and June 2025 declared that EchoStar had met or exceeded all its buildout commitments and that any FCC license revocation would be "unlawful, unconstitutional, discriminatory, and utterly baseless." EchoStar's Chairman publicly stated that EchoStar would have "won" any FCC litigation. These statements are irreconcilable with DISH's litigation position that the FCC action was unforeseeable and that EchoStar had no choice but to sell. EchoStar made a deliberate, profitable business decision; it did not capitulate to an irresistible government compulsion.

43.     On February 11, 2026, Astound sent DISH a formal Notice of Default by hard copy letter, delivered to the MSA notice addresses and to the signatory of the Force Majeure Letter, formally declaring DISH in default of its payment obligations under Section 13(b) of the MSA for failure to pay $1,574,980.54 in undisputed invoices within the sixty-day payment period specified in Section 13(b). That amount consists of the $1,566,457.63 Termination Charge Invoice plus accrued MRC for the active Services. The Notice of Default demanded cure within thirty days. A true and correct copy of the Notice of Default is attached as Exhibit G.

44.     The thirty-day cure period specified in the Notice of Default expired on March 13, 2026 without DISH having cured its default. However, on March 2, 2026, DISH notified Astound via email that it had mailed a third partial payment of $53,736.40, which Astound received on March 19, 2026.

## VII.    The Section 8(c) Cancellation Charges for In-Progress Services

45.     In early March 2026, Astound completed its review of costs incurred in connection with the 24 In-Progress Services that DISH cancelled. The Section 8(c) cancellation charges, which reflect Astound's documented third-party costs and time and materials costs incurred through the date of DISH's cancellation, total $56,931.28 (the "Section 8(c) Charges"). Astound invoiced DISH for these charges in March and April 2026.

46.     The Section 8(c) Charges are separately owed from the Termination Charges for the seventy (70) terminated installed Services, arising under a different contractual provision and calculated pursuant to a different methodology. DISH has provided no basis to dispute these charges, and its blanket force majeure defense is no more applicable to the Section 8(c) Charges than it is to the Section 9 Termination Charges.

## VIII.    DISH Terminates the Remaining Fourteen Active Services

47.     As alleged above, DISH confirmed in writing on or about December 10, 2025, that it would retain and continue paying monthly recurring charges for the fourteen (14) remaining active Services under the MSA.

48.     On or about March 27, 2026, DISH issued disconnect requests for ten (10) of the fourteen remaining active Services, with an effective disconnection date of March 31, 2026. On or about March 28, 2026, DISH issued disconnect requests for the remaining four (4) active Services, with an effective disconnection date of April 1, 2026. True and correct copies of these disconnect requests are attached hereto as Exhibit H.

14

49.     Unlike DISH's October 2025 disconnect notices, which were issued on a per-site basis, DISH's March and April 2026 disconnect requests were issued on a per-circuit basis. Because each DISH cell site received two Ethernet transport circuits from Astound, DISH issued twenty-eight (28) disconnect requests for the fourteen (14) remaining sites. This difference in format does not affect Astound's rights or DISH's obligations; all fourteen Services remain subject to early Termination Charges under Section 9 of the MSA.

50.     Astound disconnected the fourteen remaining Services upon the effective dates specified in DISH's disconnect requests. Astound will calculate the Termination Charges applicable to the fourteen terminated Services and invoice DISH accordingly in DISH's May 1, 2026 invoice. Astound anticipates that the Termination Charges for the remaining 14 Services will be in the amount of approximately $160,000 (the "Additional Termination Charges"). The Additional Termination Charges will be calculated in strict accordance with Section 9 of the MSA, in the same manner as the Termination Charges for the seventy previously terminated Services.

51.     DISH's termination of the fourteen remaining Services through the ordinary contractual disconnect process (without any invocation of force majeure, months after asserting that EchoStar's spectrum sale constituted a Force Majeure Event excusing all payment obligations under the MSA) further demonstrates that DISH's force majeure defense is pretextual. The same MSA, the same Force Majeure Clause, and the same alleged Force Majeure Event applied equally to all eighty-four Services from the outset. DISH's decision to invoke force majeure selectively as to seventy Services while voluntarily retaining and paying for fourteen others and then terminating those fourteen through standard contractual procedures without any force majeure claim is conclusive evidence that no genuine Force Majeure Event occurred.

## CLAIMS FOR RELIEF

## COUNT I

### Breach of Contract – Section 9 Termination Charges

52. Astound repeats and realleges each of the foregoing allegations as if fully set forth herein.

53. The MSA and MSO constitute a valid, binding, and enforceable contract between Astound and DISH, supported by adequate consideration.

54. Astound fully performed its obligations under the MSA and MSO, including the installation, testing, and delivery of eighty-four (84) Services for DISH between May 2023 and May 2025.

55. Between October 14 and October 21, 2025, DISH terminated seventy (70) installed Services prior to the expiration of their applicable Initial Service Terms. Under Section 9 of the MSA, DISH's early termination of each such Service obligated DISH to pay the contractually specified Termination Charge for that Service, calculated based on the applicable percentage of remaining MRC.

56. Astound calculated the aggregate Termination Charges for the seventy (70) terminated installed Services and invoiced DISH in the amount of $1,566,457.63 on November 1, 2025, in strict accordance with Section 9 of the MSA.

57. DISH has refused to pay the Termination Charges, asserting that a Force Majeure Event, specifically EchoStar's voluntary and lucrative Spectrum Transactions, excuses its payment obligations. This defense is legally baseless. EchoStar's decision to sell spectrum licenses at a premium that AT&T has acknowledged exceeds the original auction price, generating approximately $40 billion in proceeds that EchoStar's own Chairman says will leave EchoStar "cash-rich," does not constitute a Force Majeure Event as that term is exhaustively defined in Section 26(e) of the MSA.

16

The six enumerated categories of Force Majeure Events do not encompass a voluntary, profitable business transaction made by DISH's corporate parent.

58.     DISH's force majeure defense is further refuted by the public statements of EchoStar's own senior executives. EchoStar's Chairman publicly stated that EchoStar "would win" any litigation with the FCC over the spectrum licenses and that EchoStar chose to consummate the Spectrum Transactions as a business opportunity, not under compulsion. EchoStar's President and Chief Executive Officer stated that the Spectrum Transactions have kept EchoStar competing in the marketplace aggressively and that its subsidiary Boost Mobile will be more competitive operating as a hybrid MVNO. These statements directly contradict any claim that the Spectrum Transactions destroyed DISH's ability to perform its contractual obligations.

59.     Even if the Spectrum Transactions could constitute a Force Majeure Event (and they cannot) the Force Majeure Clause would not excuse DISH from payment of Termination Charges. The Termination Charges arise from DISH's own voluntary exercise of its contractual termination rights. The Force Majeure Clause excuses a party from obligations it is unable to perform due to a qualifying event; it does not excuse the financial consequences of a party's own affirmative contractual elections.

60.     DISH's refusal to pay the balance of the Termination Charges constitutes a material breach of the MSA. As a direct and proximate result of DISH's breach, Astound has suffered damages equal to the unpaid balance of the Termination Charges, together with pre-judgment interest at the applicable rate under New York law.

## COUNT II

### Anticipatory Breach of Contract – Section 8(c) Cancellation Charges and Section 9 Additional Termination Charges

61.    Astound repeats and realleges each of the foregoing allegations as if fully set forth herein.

62.    As alleged above, Astound fully performed its obligations under the MSA and MSO, including the installation, testing, and delivery of eighty-four (84) Services for DISH between May 2023 and May 2025.

63.    DISH cancelled 24 In-Progress Services, meaning Services for which Astound had commenced installation work but had not yet delivered a Connection Notice, effective December 10, 2025. Under Section 8(c) of the MSA, DISH is obligated to pay Astound the documented third-party and time and materials costs incurred through the date of cancellation, for which Astound can provide supporting invoices. Astound has completed its review of those costs and has determined that the aggregate Section 8(c) Charges total $56,931.28. Astound invoiced DISH for these charges in March and April 2026, and these charges will become due and payable within sixty (60) days in accordance with Section 13(b) of the MSA.

64.    Additionally, in March and April 2026, DISH terminated the remaining fourteen (14) installed Services prior to the expiration of their applicable Initial Service Terms. Under Section 9 of the MSA, DISH's early termination of each such Service obligated DISH to pay the contractually specified Termination Charge for that Service, calculated based on the applicable percentage of remaining MRC.

65.    Astound will calculate the Additional Termination Charges applicable to the fourteen terminated Services and invoice DISH accordingly in DISH's May 1, 2026 invoice. Astound anticipates that the Termination Charges for the remaining 14 Services will be in the amount of approximately $160,000. The Additional Termination Charges will be calculated in strict accordance

with Section 9 of the MSA, in the same manner as the Termination Charges for the seventy previously terminated Services.

66.    DISH has made unequivocal, repeated, and written declarations that it considers itself excused from all payment obligations under the MSA by virtue of its force majeure defense including through DISH's: September 25, 2025 Force Majeure Letter, and January 29, 2026 response letter. These declarations constitute an anticipatory repudiation of DISH's obligation to pay the Section 8(c) Charges and Section 9 Additional Termination Charges when they become due. DISH has not retracted or qualified this repudiation in any subsequent communication.

67.    Under New York law, an anticipatory repudiation of a contractual obligation gives rise to an immediate cause of action for breach, without requiring the non-repudiating party to wait until the date of performance. Astound is not required to wait for DISH to refuse payment before pursuing this claim, because DISH has already made unmistakably clear that it will not honor any payment obligation under the MSA.

68.    As a direct and proximate result of DISH's anticipatory repudiation of its Section 8(c) and Section 9 obligations, Astound has suffered and will suffer damages in the amount of the Section 8(c) Charges and Additional Termination Charges, together with pre-judgment interest at the applicable rate under New York law from the date such charges become due.

## COUNT III

### Declaratory Judgment – Force Majeure Defense Is Invalid

69.    Astound repeats and realleges each of the foregoing allegations as if fully set forth herein.

70.    An actual and justiciable controversy exists between Astound and DISH regarding the validity of DISH's force majeure defense. DISH has repeatedly and in writing asserted that the FCC inquiry and the Spectrum Transactions constitute a Force Majeure Event under the MSA that

19

excuses DISH from all payment obligations, including the Termination Charges and the Section 8(c)

Charges. Astound disputes this position in its entirety.

71.    DISH's force majeure defense is legally invalid for at least the following independent

reasons, each sufficient independently to defeat the defense:

(a)    The events DISH identifies (*i.e.*, the FCC inquiry and EchoStar's voluntary sale of

spectrum licenses at a multi-billion dollar profit) do not fall within any of the six

enumerated categories of Force Majeure Events under Section 26(e) of the MSA. The

Force Majeure Event definition is exhaustive and limited. It does not include regulatory

inquiries, a parent corporation's business decisions, or changes in corporate strategy.

(b)    EchoStar's own senior executives have publicly and unambiguously stated that EchoStar

was not forced to sell the spectrum licenses, that EchoStar would have prevailed in any

FCC litigation, and that the Spectrum Transactions were a voluntary, profitable business

decision. EchoStar's formal submission to the FCC called any potential revocation action

by the FCC "unlawful, unconstitutional, discriminatory, and utterly baseless." DISH

cannot simultaneously advance in this litigation a position that its own parent's most

senior leaders have publicly repudiated.

(c)    Under New York law, force majeure does not excuse a party from performance where

the claimed event was foreseeable at the time of contracting or was within the party's

reasonable control. The risk that DISH might encounter regulatory scrutiny, fail to meet

buildout milestones, change its business model, or transition to an MVNO model was

entirely foreseeable when the MSA was executed in October 2022, given DISH's publicly

documented buildout difficulties at that time.

(d)    All of the events on which DISH relies were directly attributable to the acts or omissions

of DISH and its affiliates. DISH and EchoStar chose not to meet buildout

commitments; chose not to contest the FCC inquiry; and chose to sell spectrum licenses at a premium. A party cannot invoke force majeure to escape contractual obligations when the purported excusing circumstances are of its own making.

(e)     The Termination Charges arise not from any inability of DISH to perform an obligation, but from DISH's voluntary exercise of its contractual right to terminate Services. A party cannot invoke force majeure as a shield against the financial consequences of an affirmative contractual election it made of its own volition.

(f)     The proceeds of the Spectrum Transactions – *i.e.*, the very event DISH invokes as its force majeure – will flow to EchoStar and its non-DISH affiliates, not to DISH. DISH has acknowledged this in writing, as alleged above. The availability of billions of dollars in EchoStar's hands directly contradicts any claim that the Spectrum Transactions left the broader enterprise unable to honor DISH's contractual payment obligations to Astound of approximately $1.7 million.

(g)     DISH's selective and inconsistent invocation of force majeure is itself dispositive evidence that no genuine Force Majeure Event occurred. On or about December 10, 2025, DISH confirmed in writing that it would continue to retain and pay for fourteen (14) active Services under the same MSA, subject to the same Force Majeure Clause, and allegedly affected by the same force majeure conditions it invoked to excuse the Termination Charges for the seventy terminated Services. DISH continued paying monthly recurring charges on those fourteen Services through March 2026. When DISH ultimately terminated them, it did so in March and April 2026 through standard contractual disconnect notices, with no invocation of force majeure whatsoever. A genuine Force Majeure Event does not permit a party to cherry-pick which obligations it excuses, defer termination of affected services for months while continuing to pay for

21

them, and then exit those same services through ordinary contractual procedures. DISH's selective force majeure invocation, continued voluntary performance, and ultimately standard-process termination of the remaining sites demonstrate conclusively that its force majeure invocation was a pretextual litigation position crafted to avoid specific financial consequences, not a good-faith response to an event that rendered performance impossible or impracticable.

72.     Astound is entitled to a declaratory judgment that: (i) DISH's force majeure defense under the MSA is legally invalid and without basis in fact or law; (ii) the Force Majeure Clause does not excuse DISH from its obligations to pay the Section 9 Termination Charges or the Section 8(c) Charges; and (iii) DISH is obligated to pay Astound the full amounts specified herein.

73.     Astound has no adequate remedy at law with respect to this Count because a damages award on Counts I and II would not conclusively resolve the validity of DISH's force majeure defense. DISH has asserted that defense broadly against all payment obligations under the MSA and has shown no indication it will abandon that position. Because the Additional Termination Charges have not yet been invoiced or litigated to judgment, a declaratory judgment is necessary to foreclose DISH from reasserting the same meritless defense in response to those charges and to resolve the parties' dispute fully and finally.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Astound Business Solutions, LLC respectfully demands judgment against Defendant DISH Wireless L.L.C. as follows:

(a)     On Count I, compensatory damages equal to the unpaid balance of the Section 9 Termination Charges for the seventy (70) Services terminated in October 2025, totaling $1,566,457.63; together with pre-judgment interest at the applicable rate under New York law from the date each installment became due;

22

(b)     On Count II, compensatory damages equal to: (i) the Section 8(c) Cancellation Charges, totaling $56,931.28; plus (ii) the Section 9 Additional Termination Charges of approximately $160,000 for the fourteen (14) Services terminated in March and April 2026, subject to final invoice; together with pre-judgment interest at the applicable rate under New York law from the date such charges become due or, in the Court's discretion, from the date of DISH's anticipatory repudiation of its obligations under the MSA;

(c)     On Count III, a declaratory judgment that: (i) DISH's force majeure defense is legally invalid and without basis in fact or law; (ii) the Force Majeure Clause does not excuse DISH from its obligations to pay the Section 9 Termination Charges, Section 9 Additional Termination Charges, or the Section 8(c) Cancellation Charges; and (iii) DISH is obligated to pay Astound the full amounts specified herein;

(d)     Costs of this action; and

(e)     Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Astound Business Solutions, LLC hereby demands a trial by jury on all issues so triable.

Dated: New York, New York
        April 14, 2026

WILK AUSLANDER LLP

By: /s/ Scott Watnik
        Scott Watnik (SW8120)
        Stuart M. Riback (SR2443)
        T. Jackson Brake (6043954)
    825 Eighth Avenue, Suite 2900
    New York, New York 10019
    swatnik@wilkauslander.com

23

sriback@wilkauslander.com
tjbrake@wilkauslander.com
Tel.: 646.375.7658